## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| EMILY STOCKDALE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 3:19-cv-00684 |
| | ) | |
| v. | ) | JUDGE TRAUGER |
| | ) | |
| CITY OF GALLATIN, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS

1.      Plaintiff Emily Stockdale began working for the Gallatin Police Department ("GPD") as a 911 dispatcher in 2006. (Pl. Dep. at 10.)

**RESPONSE: Undisputed.**

2.      In 2008, Plaintiff was hired to work as a police officer in the department. (*Id.* at 12.)

**RESPONSE: Undisputed.**

3.      As a police officer, Plaintiff was responsible for investigating crimes, responding to calls, and general problem solving. (Ex. Officer Job Desc.)

**RESPONSE: Undisputed. As a patrol officer, Stockdale performed initial investigations and determined if the crime were a misdemeanor or felony; if a felony, these crimes would most likely be transferred to CID. (Stockdale Dep.  20). Patrol officers are responsible for anything that comes in throughout the day and have different resources than investigators (Stockdale Dep.  21). Patrol officers wear full uniforms, Kevlar vests, and a black shirt with a badge and are out in the public. (Bandy Dep.  88, 95; Johnson 33). Generally, patrol work is more physical, and while on patrol, Stockdale was injured chasing a fleeing criminal. (Novitsky Dep.  29, 30, Ex. 29 p. 1572). CID investigations are different than those patrol officers perform and require a different level of investigation. (Stockdale Dep.  52).**

4.      After working as a patrol officer for a few years, Plaintiff was assigned to the Criminal Investigations Division ("CID") in 2012. (*Id.* at 21, 172.)

**RESPONSE: Undisputed.**

5.     GPD does not assign a specific rank for investigators within the CID, nor is there any increase in pay. (Novitsky Dep. at 28, 49; Bandy Dep. at 93.)

**RESPONSE: Disputed. Gallatin's Policies and Procedures state a transfer to CID is a promotion under the pay structure. (Johnson Dep. 35; Bandy Dep. Ex. 1 p.002370).**

6.     As an assignment, Officers have voluntarily and involuntarily moved in and out of CID over the years. (Bandy Dep. at 93.)

**RESPONSE: Undisputed.**

7.     CID is a specific division within the GPD responsible for investigating various felonies. (Pl Dep. at 20-21.)

**RESPONSE: Undisputed.**

8.     In CID, officers worked Monday through Friday 8:00 a.m. to 4:00 p.m. with also 48 hours on call shifts. (Pl. Dep. at 29.)

**RESPONSE: Undisputed. Stockdale's schedule was Monday through Friday, 8:00am to 4:00pm, and the investigators rotated by the week who was on call from 2:00-10:00pm for four to six days per month. (Stockdale Dep. 29, 30, 33). If an officer were on call, they would go out only when the phone rang. (Stockdale Dep. 30). Generally, no investigators enjoyed being on call, but it was a part of the job. (Stockdale Dep. 33). Investigators received on-call pay. (Stockdale Dep. 34).**

9.     In patrol, officers worked 6:00 a.m. to 6:00 p.m. rotating three working days one week and four working days the following week. (Pl. Dep. 211-12.)

**RESPONSE: Undisputed.**

10.     In early 2017, Lieutenant Lamar Ballard ("Lt. Ballard") began overseeing Plaintiff in CID. (*Id*. at 55.)

**RESPONSE: Undisputed.**

11.     In May 2017 and after supervising her for a few months, Lt. Ballard issued Plaintiff her yearly performance review. (*Id*. at 66-7; Pl. Dep. Ex. 1.)

**RESPONSE: Undisputed. For the years 2016 to 2017, Lt. Ballard evaluated her, although he only supervised her for a portion of the year. (Ballard Dep. 9). Stockdale again received "Commendable," a 4.2/5, 5/5 for Initiative (Dependability), a 5/5 for Planning and Organizing, and Chief Bandy commented she excels at her primary duty of working sexual abuse cases, but has a team-minded approach in all investigations." (Stockdale Dep. 67, 69; Bandy Dep. Ex. 6 p. 001038-1039, 001041, 001043). Before this evaluation she had never had an issue with her work ethic. (Stockdale Dep. 125).**

12. One of the recommendations Ballard made was for Plaintiff to develop a time management system to ensure that all follow-ups were done in a timely manner. (*Id*. at 69.)

**RESPONSE: Undisputed. Lt. Ballard evaluated other CID investigators for procrastination, including Greg Washburn. (Ballard Dep. 71, Ex. 26 p. 001789).**
**Lt. Ballard's own evaluations mentioned a need for deadlines to be met and to avoid the appearance of preferential treatment. (Ballard Dep. 67; Novitsky Dep. 10, Ex. 28 p. 001248, 001252). He admitted that timeliness issues are a common occurrence. (Ballard Dep. 68). Capt. Novitsky's evaluations of Lt. Ballard, included he "may not complete things as quickly as needed," sometimes lets things "slip through the cracks," and he should follow up with subordinates to make sure assignments are being completed. (Novitsky Dep. 11-13).**

13. In the performance evaluation, Ballard also requested Plaintiff "not procrastinate on assignments and be mindful of deadlines for assignment completion." (*Id*. at 73; Ballard Dep. at 11.)

**RESPONSE: Undisputed. However, Lt. Ballard evaluated other CID investigators for procrastination, including Greg Washburn. (Ballard Dep. 71, Ex. 26 p. 001789). Lt. Ballard would repeatedly ask him where his supplements were. (Ballard Dep. 71). While these issues were in Washburn's evaluations, Lt. Ballard could not recall any specific discipline, as evaluations are for improvement, not discipline. (Ballard Dep. 72, 75). Washburn's evaluation critiques regarding procrastination mirrored, nearly work for word, Stockdale's. (Ballard Dep. 73). Chief Bandy and Capt. Novitsky knew of Washburn's issues with time management. (Bandy Dep. 113; Novitsky Dep. 26). He was not moved to patrol. (Novitsky Dep. 26).**

14. Time management was part of being an investigator. (Pl. Dep. at 118.)

**RESPONSE: Undisputed. Investigators have a lot of discretion to prioritize cases and use their judgment. (Bandy Dep. 28, 116; Stockdale Dep. 40). Investigators prioritize based on a number of factors including determining if evidence could be destroyed, whether a child needs to be interviewed, how long it took for the crime to be reported, whether there is fresh evidence, possibility of a suspect, or timing. (Stockdale Dep. 40-41). Some officers in CID spent a significant amount of time interviewing people, others worked more from their desk, and most scheduled interviews were conducted at the department. (Stockdale Dep. 53). Different cases require different skill sets, depending whether a crime had a victim or not, minimal evidence existed, or if it was a he said/she said type of crime. (Stockdale Dep. 44).**

15.     Plaintiff was regularly spoken to about her time management because she was slower than other investigators when completing her investigation reports. (*Id*. at 119.)

**RESPONSE: Disputed. Stockdale was not slower than other investigator rather, Stockdale was more detailed in her reports. (Stockdale 74). There was no specific time frame regarding when reports or supplements needed to be completed. (Stockdale Dep. 74). Stockdale reports were detailed, including information from recordings and interviews. (Stockdale Dep. 74). While supplements had to be completed in a timely manner, these times varied. (Stockdale Dep. 76). The sex abuse cases required detailed reports and every detail to be in the reports as "the littlest statement was a huge deal." (Stockdale Dep. 78, 113). For example, Stockdale handled a sexual assault at a high school party that required her to interview many kids and took her two days at home to complete the report. (Stockdale Dep. 111). Ultimately, her reports saved time as no one, including prosecutors, had to follow up with questions as they contained all the necessary information, unlike other investigators whose lack of detail caused issues and raised questions and officers would not remember the details of the case. (Stockdale Dep. 78-80, 114).**

16.     In May 2018, Lt. Ballard issued Plaintiff the following year's performance evaluation. (*Id*. at 94; Pl. Dep. Ex. 2.)

**RESPONSE: Undisputed.**

17.     Ballard instructed Plaintiff, "Please do not procrastinate on investigative leads and interviews. Work on developing a good time management system so that all follows-ups (*sic*) are done in a timely manner." (Pl. Dep. at 96; Pl. Dep. Ex. 2.)

**RESPONSE: Undisputed. However, Lt. Ballard evaluated other CID investigators for procrastination, including Greg Washburn. (Ballard Dep. 71, Ex. 26 p. 001789).**

18.     Ballard explicitly directed Plaintiff not to procrastinate in five different areas of her performance evaluation. (Pl. Dep. Ex. 2.)

**RESPONSE: Disputed. The purpose of evaluations is for improvement, not directive. (Ballard Dep. 72, 75).**

19.     Plaintiff was given a rating of acceptable, one of the lower scores she received. (Pl. Dep. at 116-17.)

**RESPONSE: Disputed. This was the lowest score Plaintiff had ever received. (Bandy Dep. Exs. 4-7). Lt. Ballard rated Stockdale a 3.4/5, "Acceptable," shocking Stockdale (Stockdale Dep. 116, 117; Bandy Dep. Ex. 7 p. 001028). Lt. Ballard noted Stockdale**

4

conducts professional and thorough follow ups on all assigned cases, and she is very successful in the prosecution of cases. (Ballard Dep. 12; Stockdale Dep. 110; Bandy Dep. Ex. 7 p. 001022). She received a 4/5 on "Planning and Teamwork," Lt. Ballard did not give her any specific deadlines to meet, and she had an 83% closure rate, even though Lt. Ballard only rated her at a 3/5 for her closure rate. (Stockdale Dep. 97, 110; Ballard Dep. 15, 18-19; Bandy Dep. Ex. 7 p. 001022). Chief Bandy wrote that Stockdale, "is a trustworthy person and has good rapport with other agencies" and trustworthiness is very important for Stockdale's assigned duties. (Bandy Dep. 49, Ex. 7 p. 001030).

20. One of the cases Plaintiff was responsible for investigating included a burglary at a local gun store. (Pl. Dep. at 192.)

**RESPONSE: Undisputed.**

21. This burglary was part of an organized string of several gun store burglaries spanning across multiple jurisdictions and multiple states. (*Id.*; Ballard Dep. 40.)

**RESPONSE: Undisputed. While CID worked with other agencies, cases were not prioritize based on whether another agency was involved. (Stockdale Dep. 45, 47).**

22. Plaintiff worked with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") during the investigation of the burglary. (Pl. Dep. at 193.)

**RESPONSE: Undisputed. At the same time, Stockdale was assigned a homicide case which required a significant time and was considered the unit's priority. (Stockdale Dep. 200). While CID worked with other agencies, cases were not prioritize based on whether another agency was involved. (Stockdale Dep. 45, 47).**

23. As part of the investigation, an evidence sample was collected from the scene and submitted to the Tennessee Bureau of Investigation ("TBI") lab for potential DNA testing. (*Id.* at 186.)

**RESPONSE: Undisputed.**

24. The TBI inputs information from the evidence sample to conduct a search within a DNA database system known as Combined DNA Index System (CODIS). (*Id.*)

**RESPONSE: Undisputed.**

25. Once a potential DNA match for the evidence is made, the TBI provides a CODIS report to the investigating officer identifying a potential match. (*Id.*)

**RESPONSE: Undisputed.**

26.     DNA matches within the CODIS were a rare occurrence. (*Id.*; Ballard Dep. at 40.)

**RESPONSE: Undisputed.**

27.     On May 4, 2018, Plaintiff received an email with a copy of the CODIS report related to the evidence from the gun store burglary. (Pl. Dep. at 187.)

**RESPONSE: Undisputed.**

28.     The report contained identifying information including the name of the suspect, the date of birth, and the last four digits of a social security number. (*Id.* at 193.)

**RESPONSE: Undisputed.**

29.     On May 10, 2018, Plaintiff received another email informing her of the CODIS report. (*Id.* at 188-89.)

> **RESPONSE: Undisputed. The investigator submits evidence to TBI and a district attorney must submit the request to TBI stating the investigator is approved submit the evidence for examination. (Stockdale Dep. 188). As a result, both Stockdale and the Assistant District Attorney were notified of the results, and this Assistant District Attorney forwarded her notification email to Stockdale. (Id.).**

30.     During a case review on June 12, 2018, Plaintiff disclosed to Lt. Ballard that she had received a positive CODIS report for the burglary the previous month. (*Id.* at 198-99; Ballard Dep. 29-30.)

> **RESPONSE: Disputed. Stockdale noted the CODIS Report, that she had contacted DTF and followed up on the report on her daily activity report the day before. (Ballard Dep. 33). Despite Stockdale's notes, Ballard claims he never heard about the CODIS report until June 12. (Ballard Dep. 34).**

31.     Plaintiff told Lt. Ballard that she could not understand the CODIS report. (Pl. Dep. at 199; Ballard Dep. at 38.)

> **RESPONSE: Disputed. Stockdale informed the team of the CODIS hit and when Lt. Ballard questioned Stockdale on why it was taking so long and why she could not find the match, she informed him that she had attempted to locate him but was not sure why she could not find him, and she could not understand why she could not find him; not that she did not understand how to read a CODIS report. (Stockdale Dep. 198-199).**

6

32.     Plaintiff did not ask anyone for assistance on the CODIS report. (Pl. Dep. at 200.)

**RESPONSE: Disputed. Plaintiff explained to Lt. Ballard she was having difficulty locating a match. (Stockdale Dep. 198-199).**

33.     Lt. Ballard assigned Investigator Katie Hope to help Plaintiff locate the suspect, who was located later that day. (Pl. Dep. at 201-02; Ballard Dep. at 38.)

**RESPONSE: Undisputed. CID regularly worked as a team on cases. (Stockdale 38, 182; Bandy Dep. 78). Katie Hope, who had already been assisting Stockdale on the burglary case, assisted her in locating the individual from the CODIS report after she expressed her difficulty locating a match. (Stockdale 38, 182; Bandy Dep. 78)**

34.     On June 21, 2018, Plaintiff was issued a written reprimand citing unsatisfactory performance of duties. (Pl. Dep. at 203-04; Pl. Dep. Ex. 7.)

**RESPONSE: Undisputed.**

35.     The written reprimand stated in part, "It is concerning that a seasoned investigator like Investigator Stockdale would procrastinate on this case and not act on the DNA information received by TBI 42 days prior, since this is a highly sensitive case that includes multi-jurisdictional agencies, federal and multi-state assistance. This is unacceptable." (Pl. Dep. Ex. 7.)

**RESPONSE: Undisputed. However, Stockdale did not procrastinate or fail to act on the evidence, instead she had attempted to locate the suspect. (Stockdale Dep. 198-199).**

36.     The written reprimand also referenced Plaintiff's performance evaluation from the previous month where she was asked not to procrastinate on follow-ups. (*Id.*)

**RESPONSE: Undisputed.**

37.     Lt. Ballard elected to issue a written reprimand rather than an oral reprimand based on the severity of the case. (Ballard Dep. at 27-28.)

**RESPONSE: Disputed. Stockdale approached Lt. Ballard and asked why she did not receive an oral reprimand instead of a written one, as oral reprimands are removed from employee's files after two years, where written reprimands are never removed. (Stockdale Dep. 209; Bandy Dep. 79, Ex. 25 p. 0000494). Lt. Ballard stated he could have given an oral reprimand but chose a written reprimand with no justification. (Stockdale Dep. 209; Bandy Dep. Ex. 18 p. 002373).**

7

38.     Also, on June 21, 2018, Plaintiff was informed she would be reassigned from CID to patrol. (Pl. Dep. Ex. 8.)

**RESPONSE: Undisputed.**

39.     Lt. Ballard stated he lost confidence in Plaintiff because of her failure to act on the evidence. (Ballard Dep. at 44-45.)

**RESPONSE: Disputed. Lt. Ballard stated he could have given an oral reprimand but chose a written reprimand with no justification. (Stockdale Dep. 209; Bandy Dep. Ex. 18 p. 002373).**

40.     The reassignment was not considered a demotion by the Department. (Bandy Dep. at 93; Ballard Dep. at 46; Novitsky Dep. at 28.; Bandy Dep. Ex. 11)

**RESPONSE: Disputed. Gallatin's Policies and Procedures state a transfer to CID is a promotion under the pay structure. (Johnson Dep. 35; Bandy Dep. Ex. 1 p.002370). While Chief Bandy disagrees with this portion of the rules and regulations, it has not been updated to change this language, nor has a general order changed this language and newly hired officers are not considered for CID. (Bandy Dep. 134; Johnson Dep. 38). Patrol officers looked up to CID investigators, as it was prestigious and allowed for more desk work. (Stockdale Dep. 22; Bandy Dep. 93, 96). CID investigators wear plain clothes and did not have to wear a uniform or Kevlar vest. (Bandy Dep. 88; Johnson Dep. 33). CID Investigations are different than that of a patrol officer and require a different level of investigation. (Stockdale Dep. 52). Patrol officers work twelve-hour shifts and no overtime (Stockdale Dep. 211, 213).**

41.     When asked if she was aware if anyone else had held onto evidence for an extended period of time, Plaintiff stated she did not know of anyone else. (Pl. Dep. at 205, 209.)

**RESPONSE: Undisputed. Plaintiff does not have knowledge of every investigation.**

42.     Similarly, Lt. Ballard never had any officer hold onto this type of evidence for so long. (Ballard Dep. at 28).

**RESPONSE: Disputed. Lt. Ballard incorrectly insisted there were 42 days between when Stockdale received the CODIS report and the June 12 meeting, there were only 25 working days. (Ballard Dep. 31; Bandy Dep. 114). It was Lt. Ballard's decision to issue the written reprimand. (Bandy Dep. 82). Lt. Ballard drafted this reprimand and the demotion of Stockdale with Capt. Novitsky and Chief Bandy approval; although Chief Bandy was not aware of when Stockdale received the CODIS report and relied solely on Lt. Ballard and Capt. Novitsky never checked to see if Stockdale had any previous write ups. (Ballard Dep. 28, 45-46; Novitsky Dep. 21-22; Bandy Dep. 70, 75, Dep. Ex. 18 p. 002373).**

43.     In June 2018, Chief Donald Bandy elicited comments from members of the department on things that could be improved or fixed because there had been several officers who had left the department around that time, including Plaintiff's husband. (Bandy Dep. at 51-2.)

**RESPONSE: Undisputed.**

44.     Officers within the department were instructed to provide feedback. (Pl. Dep. at 164.)

**RESPONSE: Undisputed.**

45.     Following this instruction, Plaintiff and other officers including Charles Cook, James McFadden, and Katie Hope all submitted feedback letters. (Pl. Dep. at 149-50; Pl. Dep. Ex. 3; Novitsky Dep. at 16; Bandy Dep. at 53.)

**RESPONSE: Undisputed.**

46.     Plaintiff's letter focused on the members of administration within the department but did not name anyone specific. (Pl. Dep. at 150; Pl. Dep. Ex. 3.)

**RESPONSE: Undisputed.**

47.     Plaintiff's letter did not reference any laws that had been broken. (Pl. Dep. at 164; Pl. Dep. Ex. 3.)

**RESPONSE: Undisputed.**

48.     After Plaintiff submitted her letter, Chief Bandy and Captain Novitsky met with her to discuss her concerns. (Pl. Dep. at 165; Novitsky Dep. at 17; Bandy Dep. at 56.)

**RESPONSE: Undisputed. Stockdale was pulled into a meeting with Chief Bandy and Captain Kate Novitsky. (Novitsky Dep. 17; Stockdale Dep. 165; Bandy Dep. 56, Ex. 18 p. 002373, Ex. 19 p. 002380).**

49.     The three discussed Plaintiff's husband leaving the department (Pl. Dep. at 166-67; Novitsky Dep. at 17; Bandy Dep. at 59-60.)

**RESPONSE: Undisputed.**

50.    Plaintiff also referenced her concern about the "buddy-buddy" system within the administration. (Pl. Dep. at 168; Bandy Dep. at 60.)

**RESPONSE: Undisputed.**

51.    Plaintiff referenced a comment made by Lt. Ricky Troutt in 2013 in which he stated, "bitch work is for bitches." (Pl. Dep. at 169; Bandy Dep. at 61.)

**RESPONSE: Undisputed. She also discussed how ranking officers were able to keep their ranks despite disciplinary actions, and that she had experienced derogatory statements regarding her gender. (Stockdale Dep.  172, 177; Bandy Dep.  61). Although Chief Bandy and Capt. Novitsky maintain Stockdale never spoke to them about gender discrimination, Stockdale, "brought forth attention of her concerns that Lt. Ballard treated the women in CID different than the men, scrutinizing our investigative work while not scrutinizing that of the make investigators, and criticizing us publicly in case review meetings." (Bandy Dep.  123, Ex. 18 p. 002373, Ex. 19 002398-2390).**

52.    Chief Bandy had issued Troutt an oral reprimand in his file for the comment. (Bandy Dep. at 61.)

**RESPONSE: Undisputed.**

53.    Plaintiff also referenced an incident with Assistant Chief Bill Sorrells, who had been disciplined by Chief Bandy. (Pl. Dep. at 153; Bandy Dep. at 61.)

**RESPONSE: Undisputed.**

54.    At some point during the conversation, Chief Bandy left the room and Plaintiff continued her discussions with Captain Novitsky. (Pl. Dep. at 178; Novitsky Dep. at 18.)

**RESPONSE: Undisputed. Although Chief Bandy and Capt. Novitsky maintain Stockdale never spoke to him about gender discrimination, Stockdale, "brought forth attention of her concerns that Lt. Ballard treated the women in CID different than the men, scrutinizing our investigative work while not scrutinizing that of the make investigators, and criticizing us publicly in case review meetings." (Bandy Dep.  123, Ex. 18 p. 002373, Ex. 19 002398-2390).**

55.    Plaintiff and Novitsky talked about Plaintiff's recent performance evaluation, which had been lower than her others. (Pl. Dep. at 180; Novitsky Dep. at 18.)

**RESPONSE: After Chief Bandy left, Stockdale continued to speak with Capt. Novitsky about the case review incident with Lt. Ballard, and complained about Lt.**

Ballard's treatment, to which Capt. Novitsky stated he was better than he used to be. (Stockdale Dep. 178-179; Novitsky Dep. 19). Plaintiff stated Lt. Ballard interrogated her and accused her of lying and not showing him images from a scene, which she had previously shown him. (Stockdale Dep. 130). His case reviews caused Stockdale anxiety and she began to dread them and emotionally prepare for them each week. (Stockdale Dep. 131, 133). Despite Lt. Ballard's treatment of her, Stockdale apologized for leaving case review meeting and tried to discuss his treatment of her. (Stockdale Dep. 132). Plaintiff stated Lt. Ballard continued to spend more time reviewing her cases than anyone else's and would criticize her in front of all the other investigators. (Stockdale Dep. 136-137). Stockdale discussed her evaluation with the unfairly low score with Capt. Novitsky who told her she did good work, her reports are thorough, and she was not the only one Lt. Ballard cited for procrastination. (Stockdale Dep. 180; Novitsky Dep. 18).

56.    Captain Novitsky informed Plaintiff her evaluation was not the only one that cited procrastination. (Novitsky Dep. at 18.)

**RESPONSE: Undisputed. Stockdale discussed her recent evaluation with the unfairly low score with Capt. Novitsky who told her she did good work, her reports are thorough, and she was not the only one Lt. Ballard cited for procrastination. (Stockdale Dep. 180; Novitsky Dep. 18).**

57.    Plaintiff told Novitsky she did not get along with Lt. Ballard. (Pl. Dep. at 179; Novitsky Dep. at 18-19.)

**RESPONSE: Disputed. Stockdale spoke with Capt. Novitsky about the case review incident with Lt. Ballard, and complained about Lt. Ballard's treatment of her, to which Capt. Novitsky stated he was better than he used to be. (Stockdale Dep. 178-179; Novitsky Dep. 19). Stockdale discussed her recent evaluation with the unfairly low score with Capt. Novitsky who told her she did good work, her reports are thorough, and she was not the only one Lt. Ballard cited for procrastination. (Stockdale Dep. 180; Novitsky Dep. 18). Novitsky told Stockdale in this meeting, that Stockdale was a thorough in her report writing and did good work. (Stockdale Dep. 180).**

**Stockdale explained to Novitsky Lt. Ballard's treatment of her in case review. (Stockdale Dep. 178-180). Further, she discussed with Novitsky the case review where Lt. Ballard's behavior was so extreme Stockdale left in the middle to go to the restroom so as not to suffer further embarrassment and cry in front of her colleagues; usually she was able to "suck[] it in." (Stockdale Dep. 129-130, 178-180). In this case review, Lt. Ballard interrogated Stockdale and accused her of lying and not showing him images from a scene, which she had previously shown him. (Stockdale Dep. 130). His case reviews caused Stockdale anxiety and she began to dread them and emotionally prepare for it each week. (Stockdale Dep. 131, 133). Despite Lt. Ballard's treatment of her, Stockdale apologized for leaving case review meeting and tried to discuss his treatment of her. (Stockdale Dep. 132). Lt. Ballard continued to spend more time reviewing her cases than anyone else's and would criticize her in front of all the other investigators. (Stockdale Dep. 136-137).**

11

58.     On July 6, 2018, GPD was notified of three rape kits in cases that Plaintiff had been investigating which needed to be picked up from Our Kids. (Bandy Dep. at 100.)

**RESPONSE: Undisputed. After her demotion to patrol, Stockdale received an email from Our Kids stating they had rape kits to be picked up. (Stockdale Dep. 215; Bandy Dep. 104). She forwarded the email to the evidence tech, as she was no longer on CID and it was not part of her job duties to pick these kits up; instead, evidence or another investigator would have. (Bandy Dep. 104; Stockdale Dep. 216-217).**

59.     Two of the rape kits were performed by Our Kids in March 2018 and the other was from May 2018. (Novitsky Dep. 31-32.)

**RESPONSE: Undisputed.**

60.     Captain Kate Novitsky interviewed Plaintiff to determine why the rape kits had not been picked up. (*Id.*)

**RESPONSE: Undisputed.**

61.     Tennessee Code Annotated § 39-13-519 requires law enforcement agencies to submit such kits to the Tennessee Bureau of Investigation ("TBI") for DNA testing.

**RESPONSE: Disputed. T.C.A. Ann. § 39-13-519 states the agency shall submit the evidence kit to TBI within sixty (60) days of taking possession of the kit. This statute does not impose a specific timeframe for the rape kit to be released to law enforcement. Further, the statute states a chain of custody for the Sexual Assault Evidence Kit or hold kit shall be established and the kit will be prepared for DNA testing or storage in accordance with established protocols. (National Center on Domestic and Sexual Violence, *Tennessee Model Law Enforcement Policy on Sexually Oriented Crimes* (Oct. 29, 2020), http://www.ncdsv.org/DVSCC_Tennessee-Model-Law-Enforcement-Policy-on-Sexually-Oriented-Crimes_2016.pdf).**

**        After her demotion to patrol, Stockdale received an email from Our Kids stating they had rape kits to be picked up. (Stockdale Dep. 215; Bandy Dep. 104). She forwarded the email to the evidence tech, as she was no longer on CID and it was not part of her job duties to pick these kits up; instead, evidence or another investigator would have. (Bandy Dep. 104; Stockdale Dep. 216-217).**

**        GPD's only policy regarding rape kits requires that when it is complete it should be in the investigators notes. (Bandy Dep. 33, 98, 101; Novitsky Dep. 35). Lt. Ballard told Capt. Novitsky is was uncommon for kits to be picked up at Our Kids. (Novitsky Dep. 36). Wherever the rape kit is performed is a secure part of the chain of command, and at no point in time was the chain of custody regarding the rape kits broken. (Bandy Dep. 35, 100; Ballard Dep. 49; Dennis Decl. p. 2).**

62.     When Captain Novitsky asked her about the existence of the rape kits, Plaintiff stated she was unaware of them. (Novitsky Dep. at 32.)

**RESPONSE: Disputed. Typically, with children, as were these cases, rape kits were not performed, just exams. (Stockdale Dep. 217). An internal investigation was performed, and Stockdale met with Capt. Novitsky and Lt. Shockley twice. (Stockdale Dep. 222). However, Stockdale was questioned about cases months after they occurred and before she was given a chance to review the files. (Bandy Dep. 108).**

63.     When Captain Novitsky reviewed the file from the March 2018 case, she found a copy of the report from Our Kids stating that a rape kit had been conducted. (*Id.*; Pl. Dep. at 236-37.)

**RESPONSE: Undisputed.**

64.     Further, Plaintiff had written down "rape kit and exam" on a notepad within the file. (Pl. Dep. at 235-36; Novitsky Dep at 32; Pl. Dep. Ex. 11.)

**RESPONSE: Undisputed.**

65.     On May 14, DCS case worker Rebecca Page emailed Plaintiff with notes about the rape kit performed days earlier. (Ex. Page Email.)

**RESPONSE: Disputed. The email stated that the team decided to minimally sedate the child by giving her Versed, but that the child refused to drink as the this would cause her to "pee" and it hurts her to have to use the restroom. (Ex. Page Email). The continued email notes the exam proceeding forward but makes no other mention of a rape kit or what was done with the rape kit. The notes do not clarify whether the kit was completed or if Our Kids chose to proceed with only the exam.**
       **Before Stockdale was ever notified of any rape kits, arrests for both cases were made kits and were almost same day arrests and were closed by the arrests. (Ballard Dep. 51; Stockdale Dep. 251, 252). The availability of the rape kits had no impact on the outcome of the cases as both suspects confessed. (Stockdale Dep. 252; Bandy Dep. 116, 117). While for the**

66.     When Captain Novitsky presented her with the information about the rape kits from her case files in a second interview, Plaintiff stated she must have forgotten to follow up on it. (Novitsky Dep. at 32; Pl. Dep. Exs. 9, 11.)

**RESPONSE: Disputed. Plaintiff did not state that she must have forgotten to follow up on the kits. (Stockdale Dep. Ex. 11 p. 1529). Capt. Novitsky has stated Plaintiff said she must have forgotten, and the suspension said she stated this, but no documents exist to support this. (Stockdale Dep. Ex. 11 p. 1529). Plaintiff testified:**

**I have reviewed over many Our Kids Reports, but do not necessarily read over them all because I usually know the outcome prior to receiving the paper documents. I would have not read over this particular Our Kids Report on this case because I was unaware that rape kits were performed on either of the children, and there were no concerns that penetration occurred. . . Also from speaking with the DCS case worker involved in this case there was never any concern or indication noted that rape kits were performed. (Stockdale Dep. Ex. 11 p. 1529).**

**Regarding the May 2018 rape kit, Stockdale never received an Our Kids report on this case testifying there was a rape kit, "[a]s soon as I received such notification, I acted immediately on the next steps in order to have the kits picked up. (Stockdale Dep. Ex. 11 p. 1531). Plaintiff followed policy when she received the notification and forwarded it to CID. (Bandy Dep. 104; Stockdale Dep. 216-217).**

67.     On August 7, 2018, Plaintiff was issued a Notice of Minor/Major Suspension. (Pl. Dep. at 219-20; Pl. Dep. Ex. 9.)

**RESPONSE: Undisputed. Chief Bandy made the determination to suspend Stockdale with no understanding of Our Kids' rape kit process and notification policies or protocols, including how long other investigators took to pick them up. (Bandy Dep. 101, 105). Capt. Novitsky also never checked with Our Kids about their standard procedures. (Novitsky Dep. 45). Our Kids stores and preserves the kit until it is picked up by law enforcement; and there is no time frame within which a kit must be picked up as it is not uncommon to notify law enforcement multiple times of the kits availability. (Dennis Decl. p. 2).**

**Part of the justification for the suspension, although not listed on the suspension report, but instead the fact sheet, was truthfulness. (Bandy Dep. 109, Ex. 12-13). While the word "rape" was written in the case file, Stockdale maintained she was not aware of any rape kit, nor had she ever had to pick up a rape kit involving a child. (Stockdale Dep. 224, 254; Bandy Dep. Ex. 19 p. 002381).**

68.     The Notice identified Plaintiff had violated GPD General Orders Rule Number 10 for neglect of duty and Number 12 for truthfulness. (Pl. Dep. at 225; Pl. Dep. Ex. 9.)

**RESPONSE: Disputed. The Notice did not identify Plaintiff had violated Rule Number 10 and 12. (Stockdale Dep. Ex. 9). The separate notes stated Stockdale violated Rule Nos. 10 and 12. (Stockdale Dep. Ex. 9).**

69.     The Notice stated, "Failure to follow up on retrieving 3 rape kits held by Our Kids Clinic related to 2 different cases from March and May of this year. Also failure to follow up on returning

property to the next of kin from a suicide case from December of last year." (Pl. Dep. at 220; Pl. Dep. Ex. 9.)

**RESPONSE: Undisputed. Regarding the suicide, as the person was no longer a minor, per policy, Stockdale told the family they would need an order from the court to obtain the person's belongings. (Stockdale Dep. 253). Stockdale wrote a rebuttal regarding her suspension; however, Chief Bandy never spoke about it with Stockdale, although he testified would have spoken with command staff about it. (Bandy Dep. 109-110).**

70. In discussing the reason why the suspension was issued, "[Plaintiff] had knowledge of those kits while she was assigned to CID and neglected to make arrangements to have those kits picked up." (Novitsky Dep. at 32.)

**RESPONSE: Disputed. After her demotion to patrol, Stockdale received an email from Our Kids stating they had rape kits to be picked up. (Stockdale Dep. 215; Bandy Dep. 104). She forwarded the email to the evidence tech, as she was no longer on CID and it was not part of her job duties to pick these kits up; instead, evidence or another investigator would have. (Bandy Dep. 104; Stockdale Dep. 216-217). Typically, with children, as were these cases, rape kits were not performed, just exams. (Stockdale Dep. 217). An internal investigation was performed, and Stockdale met with Capt. Novitsky and Lt. Shockley twice. (Stockdale Dep. 222).**

71. Plaintiff was suspended for three days - August 10, 11, and 12, 2018. (Pl. Dep. at 221; Pl. Dep. Ex. 9.)

**RESPONSE: Undisputed.**

72. After serving the three-day suspension, Plaintiff sent a letter to Mayor Paige Brown and Chief Bandy on August 14, 2018. (Pl. Dep. at 226, 228-29; Pl. Dep. Ex. 10; Brown Dep. at 20-21.)

**RESPONSE: Disputed. While addressed to both Mayor Brown and Chief Bandy, this letter was initially only sent to Mayor Brown. (Stockdale Dep. 226, 228; Brown Dep. 21; Bandy Dep. Ex. 18 p. 002373).**

73. In her letter Plaintiff alleged she had been retaliated against for complaining about the treatment of women including her treatment in CID. (Pl. Dep. at 226-27; Pl. Dep. Ex. 10.)

**RESPONSE: Undisputed.**

74. Plaintiff stated her email was her first communication made to an elected official about her allegations. (Pl. Dep. at 227.)

**RESPONSE: Undisputed.**

75.    Upon receiving Plaintiff's letter, Mayor Brown told Plaintiff that her allegations needed to be investigated and that HR would be contacting her. (Brown Dep. at 22; Pl. Dep. at 232.)

**RESPONSE: Undisputed.**

76.    On August 21, 2018, Plaintiff also submitted a rebuttal letter to her discipline she had received. (Pl. Dep. at 235; Pl. Dep. Ex. 11.)

**RESPONSE: Undisputed.**

77.    The City's HR Director Debbie Johnson conducted an investigation into Plaintiff's allegations. (Johnson Dep. at 12-13; Pl. Dep. Ex. 4.)

> **RESPONSE: Undisputed. Ms. Johnson's timeline for making a finding was between seven to ten days, did not interview any former employees of GPD, nor did she ask any employees if they feared retaliation. (Johnson Dep. 13, 25). Chief Bandy requested Capt. Novitsky interview the other women in the department. (Novitsky Dep. 42; Johnson Dep. 27). Johnson admitted she never considered Stockdale's transfer to patrol in her findings but did consider her clearance rate. (Johnson Dep. 37, 44). When Johnson interviewed Hope, she did not ask about the feedback she provided at Chief Bandy's request stating officers fear to be honest and are fearful of repercussions for doing so despite Chief Bandy providing her with the June 2018 complaints. (Bandy Dep. 53; Johnson Dep. 47, Ex. 35 p. 2489). Ms. Johnson interview Lt. Ballard for over an hour, and he was able to write a rebuttal to Stockdale's allegations. (Ballard Dep. 61; Bandy Dep. Ex. 19 p. 2386-2389). In this letter, he alleged that Stockdale lacked certain skills, however no concerns regarding her skillset were documented. (Ballard Dep. 62). Ms. Johnson considered letters from other lieutenants, one of which focused on the improper tone and manner in which Plaintiff wrote her letter of complaint but admitted the sergeants incorrectly took the request for feedback out of context and incorrectly explained the purpose to employees, including Plaintiff (Bandy Dep. Ex. 19 p. 002393). No action was taken or discussed after HR submitted its report. (Bandy Dep. 127).**

78.    A total of 19 interviews were conducted as part of the investigation from August 21-30, 2018. (Johnson Dep. at 20-21; Pl. Dep. Ex. 4.)

**RESPONSE: Undisputed.**

79.    Upon the conclusion of the investigation, Ms. Johnson issued a report with her findings. (Johnson Dep. at 30; Pl. Dep. Ex. 4.)

**RESPONSE: Undisputed.**

80.     Johnson found that Plaintiff's claims of gender discrimination and retaliation were not

substantiated or supported by the evidence. (Johnson Dep. at 30-31; Pl. Dep. Ex. 4.)

> **RESPONSE: Undisputed. Ms. Johnson's timeline for making a finding is between seven to ten days, did not interview any former employees of GPD, nor did she ask any employees if they feared retaliation. (Johnson Dep. 13, 25). Chief Bandy requested Capt. Novitsky interview the other women in the department. (Novitsky Dep. 42; Johnson Dep. 27). Johnson admitted she never considered Stockdale's transfer to patrol in her findings but did consider her clearance rate. (Johnson Dep. 37, 44). When Johnson interviewed Hope, she did not ask about the feedback she provided at Chief Bandy's request stating officers fear to be honest and are fearful of repercussions for doing so despite Chief Bandy providing her with the June 2018 complaints. (Bandy Dep. 53; Johnson Dep. 47, Ex. 35 p. 2489). Ms. Johnson interview Lt. Ballard for over an hour, and he was able to write a rebuttal to Stockdale's allegations. (Ballard Dep. 61; Bandy Dep. Ex. 19 p. 002386-2389). In this letter, he alleged that Stockdale lacked certain skills, however no concerns regarding her skillset were documented. (Ballard Dep. 62). Ms. Johnson considered letters from other lieutenants, one of which focused on the manner in which Stockdale wrote her letter of complaint while also admitting the sergeants he spoke to regarding requesting feedback was taken out of context by the sergeants. (Bandy Dep. Ex. 19 p. 002393). No action was taken or discussed after HR submitted its report. (Bandy Dep. 127).**

81.     On January 11, 2019, Plaintiff filed an EEOC charge against the City alleging gender

discrimination and retaliation. (Pl. Dep. at 240; Pl. Dep. Ex. 12.)

> **RESPONSE: Undisputed.**

82.     When asked whether any specific event prompted her to file her charge at that point in

time, Plaintiff identified the general events and investigation which she had previously experienced. (Pl.

Dep. at 240.)

> **RESPONSE: Undisputed. Plaintiff submitted multiple letters of complaints regarding the discrimination and treatment she experienced from executive members of the GPD of which Chief Bandy was aware. (Stockdale Dep. 142, 144, 150-151, 226, 228; Brown Dep. 21; Ballard Dep. 61; Bandy Dep. Ex. 8 p. 002375-2377, Ex. 18 p. 002373, Ex. 19 p. 002386-2389).**

83.     On June 21, 2019, Plaintiff provided the City with her notice of resignation with her

final date of employment to be July 11, 2019. (Bandy Dep. at 129; Bandy Dep. Ex. 21.)

> **RESPONSE: Undisputed.**

84. Chief Bandy was surprised and disappointed that Plaintiff was leaving. (Bandy Dep. at 129.)

**RESPONSE: Disputed. Plaintiff submitted multiple letters of complaints regarding the discrimination and treatment she experienced from executive members of the GPD of which Chief Bandy was aware. (Stockdale Dep. 142, 144, 150-151, 226, 228; Brown Dep. 21; Ballard Dep. 61; Bandy Dep. Ex. 8 p. 002375-2377, Ex. 18 p. 002373, Ex. 19 p. 002386-2389).**

85. Plaintiff provided her resignation after having secured employment elsewhere. (Pl. Dep. at 244.)

**RESPONSE: Undisputed.**

86. Plaintiff began working her next job the week following her last day with the GPD. (Pl. Dep. at 247.)

**RESPONSE: Undisputed.**

87. When asked what led her to resign from her employment, Plaintiff identified her treatment by Lt. Ballard as well as her write-ups from June 2018 and her suspension in August 2018. (Pl. Dep. at 244-45.)

**RESPONSE: Undisputed. Plaintiff submitted multiple letters of complaints regarding the discrimination and treatment she experienced from executive members of the GPD of which Chief Bandy was aware. (Stockdale Dep. 142, 144, 150-151, 226, 228; Brown Dep. 21; Ballard Dep. 61; Bandy Dep. Ex. 8 p. 002375-2377, Ex. 18 p. 002373, Ex. 19 p. 002386-2389).**

88. While she was on patrol, Plaintiff never experienced any derogatory comments about her gender. (Pl. Dep. at 238.)

**RESPONSE: Disputed. Throughout her career other male officers would make comments in general about females or talking about females they had just dealt with on the street through conversations, everybody being in the shift patrol room and people making remarks and comments. (Stockdale Dep. 177-178). On one occasion, Plaintiff was told by Lt. Troup, "bitch work is for bitches." (Stockdale Dep. at 169; Bandy Dep. at 61).**

89. When asked whether she experienced any discriminatory treatment once she moved to patrol, Plaintiff stated she was requested to provide notes for sick time on January 15, 2019. (Pl. Dep. at 245-46; Pl. Inter. Resp. No. 5.)

**RESPONSE: Undisputed. Plaintiff also experienced retaliatory treatment by way of the major/minor suspension. (Stockdale Dep. Ex. 9).**

90.     Plaintiff was never written up for not providing doctor's notes. (Pl. Dep. at 246.)

**RESPONSE: Undisputed. However, this was because Stockdale complied with Defendant's requirement's she provide a doctor's note for every individual doctor's appointment despite policy stating a note is only required when an employee missed three days of work. (Stockdale Dep. 243).**

91.     Plaintiff also stated she was not permitted to make copies of cases for herself. (Pl. Dep. at 246.)

**RESPONSE: Undisputed. She was not allowed to even have access her previous case files from her time in CID for court and was required to have the CID secretary make copies. (Stockdale Dep. 244-246).**

92.     Instead, the secretary in CID made copies for Plaintiff. (Pl. Dep. at 246.)

**RESPONSE: Undisputed.**

93.     When asked to provide any similarly situated male comparators for her discrimination claims under the THRA and Title VII, Plaintiff identified the following individuals: Kaleb Hammock; Jonathan McGuire; Charles Cook; James Kemp; Greg Washburn; Charlie Belote; Neil Toll; Tim Anshuetz; Bill Storment; Brad Jones. (Pl. Inter. Resp. No. 5.)

**RESPONSE: Undisputed.**

94.     Plaintiff also acknowledged Lt. Ballard had a good working relationship with Katie Hope. (Pl. Dep. at 126, 234.)

**RESPONSE: Undisputed. However, during the time Stockdale experienced discrimination, harassment, and retaliation from Lt. Ballard, Ms. Hope was new to the CID unit and only worked under Lt. Ballard for 6 months at the time Stockdale was demoted. (Stockdale Dep. 127-128).**

## PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS

1.      Pursuant to GPD's Procedures, a transfer to the Criminal Investigations Division ("CID") is a promotion under the pay structure. (Johnson Dep. 35; Bandy Dep. Ex. 24 p.002370).

**RESPONSE:**

2.      Patrol officers looked up to CID investigators, as that position was prestigious but also required more desk work. (Stockdale Dep. 22; Bandy Dep. 93, 96).

**RESPONSE:**

3.      CID investigators wear plain clothes and do not wear a uniform or Kevlar vest daily. (Bandy Dep. 88; Johnson Dep. 33). CID investigations require a different level of investigation than a routine patrol investigation. (Stockdale Dep. 52).

**RESPONSE:**

4.      Stockdale's CID schedule was Monday through Friday, 8:00am to 4:00pm, and the investigators rotated call weekly from 2:00-10:00pm for four to six days per month. (Stockdale Dep. 29, 30, 33). If an investigator were on call, they would go out only when the phone rang. (Stockdale Dep. 30). Investigators received on-call pay. (Stockdale Dep. 34). '

**RESPONSE:**

5.      CID duties largely involved emails, calls, and case investigations. (Stockdale Dep. 34). CID Supervisors assigned cases unless the investigator received the call during their on-call shift. (Stockdale Dep. 35). Investigators have a lot of discretion to prioritize cases and use their judgment. (Bandy Dep. 25, 28, 116; Stockdale Dep. 40). While CID worked with other agencies, cases were not prioritized based on whether another agency was involved. (Stockdale Dep. 45, 47).

**RESPONSE:**

6.      Stockdale was passionate about investigating sex crimes and responsible for all DCS referrals, which were not included in the calculation of her caseload. (Stockdale Dep. 38-39;

Bandy Dep. 121; Belote Decl. ¶¶7-11). Stockdale had a unique ability to work these types of cases, largely due to her thorough investigations and attention to detail, ensuring no fact was missed. (Storment Decl. ¶ 4). GPD leaned on Ms. Stockdale and her ability to work these types of crimes, investing time and resources into specialized training. (Storment Decl. ¶ 4).

**RESPONSE:**

7.    There was no specific time frame for reports or supplements to be completed. (Stockdale Dep. 74, 76; Bandy Dep. Ex. 5 p. 1050 ("follows up on assigned cases regularly...pursues all investigative leads in a timely manner").

**RESPONSE:**

8.    Stockdale's reports were detailed, including information from recordings and interviews. (Stockdale Dep. 74-76, 113; Belote Decl. ¶5; Bandy Dep. Ex. 5 p. 1050, 1052, 1057). Ultimately, her reports saved time as no one, including prosecutors, had to follow up with questions as they contained all the necessary information, unlike other investigators whose lack of detail caused issues and raised questions and officers would not remember the details of the case. (Stockdale Dep. 78-80, 114; Bandy Dep. Ex. 6 p. 1035 ("..[Stockdale] is very successful in prosecution of cases. She is very organized.").

**RESPONSE:**

9.    Before her complaints, Stockdale rated 3 out of 5, typically higher, on her evaluations for overall job performance. (Bandy Dep.  39, 132, Ex. 4-7). For example, the following was noted: 2016/2017 4.2/5 overall, 5/5 for Initiative (Dependability), a 5/5 for Planning and Organizing. Chief Bandy noted: "[s]he excels at her primary duty of working sexual abuse cases but has a team-minded approach in all investigations." (Stockdale Dep. 67, 69; Bandy Dep. Ex. 6 p. 001038-1039, 001041, 001043).

**RESPONSE:**

10.     It was well known that Stockdale was very detailed oriented in her reports and supplements, even though it resulted in a timeliness issue at times, which had been noted on her evaluations for years. (Stockdale Dep. 72-73, 75, 97, 110; Bandy Dep. Ex. 4 at 1065, 1069-1070, Ex. 6 pp. 1022, 001038; Ballard Dep. 15, 18-19; Belote Decl. ¶¶12, 13). Stockdale was regarded as conducting professional and thorough follow-ups on all assigned cases and was successful in the prosecution of cases. (Ballard Dep. 12; Stockdale Dep. 110; Bandy Dep. Ex. 7 p. 001022).

**RESPONSE:**

11.     Chief Bandy found Stockdale "is a trustworthy person and has good rapport with other agencies." (Bandy Dep. 49, Ex. 7 p. 001030).

**RESPONSE:**

12.     Stockdale also received many commendations and recognitions including awards from Ashley's Place (2016-2018), Investigator of the Year (2015), Outstanding CPIT Member of the Year (2018), and a 2015 internal award recognizing an officer's letters of great service from citizens and recognition for attending more forensic interviews than any other investigator in Sumner County. (Ballard Dep. 16, 20; Bandy Dep. 17-18, Ex. 1, Ex 2 p. 001123, 001126, 001127-1130, 1503, Ex. 4 p. 1072).

**RESPONSE:**

13.     In April 2018, just prior to her protected conduct, Stockdale was commended for her homicide work during a particularly busy time for the CID. (Bandy Dep. 18-19, Ex. 3 p. 1509; Ballard Dep. 20).

**RESPONSE:**

14.     Lt. Ballard had issues with meeting deadlines and avoiding the appearance of preferential treatment. (Ballard Dep. 67; Novitsky Dep. 10, Ex. 28 p. 001248, 001252). Capt. Novitsky acknowledged Ballard "may not complete things as quickly as needed," sometimes lets

things "slip through the cracks," and suggested better follow-up with subordinates to make sure assignments are being completed. (Novitsky Dep. 11-13).

**RESPONSE:**

15.     Ballard admitted that timeliness issues are a common occurrence with other officers. (Ballard Dep. 68; Bandy Dep. 113; Novitsky Dep. 26).

**RESPONSE:**

16.     Lt. Ballard evaluated other CID investigators for procrastination, including Greg Washburn. (Ballard Dep. 71, Ex. 26 p. 001789). While these issues were in Washburn's evaluations, Lt. Ballard could not recall any specific discipline, but contended Washburn's evaluations were for improvement, not discipline. (Ballard Dep. 72, 75). Washburn's evaluation critiques regarding procrastination mirrored, nearly word for word, Stockdale's. (Ballard Dep. 73). He was not moved to patrol. (Novitsky Dep. 26).

**RESPONSE:**

17.     Lt. Ballard did not have the same confidence in his female subordinates that he did in his male subordinates. (Storment Decl. ¶20-22). Lt. Ballard was direct, aggressive, condescending, and humiliated Stockdale. (Stockdale Dep. 57, 124, 137; Belote Decl. ¶¶14-19; Storment Decl. ¶15-18). Whenever he talked to Stockdale, it was more akin to an interrogation. (Stockdale Dep. 57, 59, 126; Belote Decl. ¶¶ 15-17; Storment Decl. ¶17).

**RESPONSE:**

18.     Lt. Ballard would mock Stockdale in front of the other investigators "not [to] spend as much time as Emily does." (Stockdale Dep. 105, 131). Meanwhile, Greg Washburn would forget a file for case review. (Stockdale Dep. 106; Bandy Dep. Ex. 19 p. 002381).

**RESPONSE:**

19.      During one case review, Lt. Ballard's behavior was so extreme Stockdale left in the middle to escape the humiliation. (Stockdale Dep. 129-130; Bandy Dep. Ex. 19 p. 002381;

Belote Decl. ¶¶15-19; Storment Decl. ¶16 ("Lt. Ballard would badger and belittle Ms. Stockdale, to the point in which it became unethical and so inappropriate that she had to leave in the middle of the case review to compose herself.")). Lt. Ballard interrogated her and accused her of lying and not showing him images from a scene, which she had previously shown him. (Stockdale Dep. 130; Belote Decl. ¶¶16-17). Lt. Ballard continued to spend more time reviewing her cases than anyone else's and would criticize her in front of all the other investigators. (Stockdale Dep. 136-137; Storment Decl. ¶15).

**RESPONSE:**

20.    On June 4, 2018, Stockdale submitted her feedback to Lt. Ballard, focused on how people were treated and the retaliation of those who spoke out, the GPD's "buddy-buddy" system, administrators leading with "intimidation tactics" and "retaliation against employees," harassment, fairness in discipline, and the sexist statement, "bitch work is for bitches." (Stockdale Dep. 142, 144, 150-151; Bandy Dep. Ex. 8 p. 002375-2377; Ballard Dep. 21).

**RESPONSE:**

21.    Chief Bandy discussed the letters in a meeting with all command staff, including Lt. Ballard. (Ballard Dep. 22). Lt. Ballard had issue with the "way" Stockdale expressed complaints rather than suggestions. (Ballard Dep. 23, 26). Lt. Ballard and the command staff were immediately defensive regarding the feedback. (Bandy Dep. 66).

**RESPONSE:**

22.    Around June 11, 2018, Stockdale was pulled into a meeting with Chief Bandy and Captain Kate Novitsky to discuss her complaint. (Novitsky Dep. 17; Stockdale Dep. 165; Bandy Dep. 56, Ex. 18 p. 002373, Ex. 19 p. 002380). Stockdale told them that she wanted to be left alone, meaning she did not want any problems. (Stockdale Dep. 181; Bandy Dep. Ex. 19 p. 002380). Stockdale explained about the "buddy-buddy system" and being told, "bitch work is for bitches" by Lt. Troutt (Bandy Dep. 60, Ex. 19 p. 2398). Chief Bandy remarked that Lt. Troutt was a good

officer, just not good with words. (Stockdale Dep. 169). She also discussed how ranking officers were able to keep their ranks despite disciplinary actions and that she had experienced derogatory statements regarding her gender. (Stockdale Dep. 172, 177; Bandy Dep. 61). Stockdale, "brought forth attention of her concerns that Lt. Ballard treated the women in CID different than the men, scrutinizing our investigative work while not scrutinizing that of the male investigators, and criticizing us publicly in case review meetings." (Bandy Dep. 123, Ex. 18 p. 002373, Ex. 19 002398-2390).

**RESPONSE:**

23.     On June 21, 2018, approximately two weeks after Chief Bandy's meeting with command staff, including a defensive Lt. Ballard, regarding the letters of complaint, Stockdale received a written reprimand from Bandy and Ballard and was transferred back to patrol. (Stockdale Dep.  206-207; Bandy Dep. 66, 79, Ex. 9 p. 001515). The reprimand was related to a CODIS report Stockdale received on May 4, 2018, showing a DNA match regarding a burglary that occurred in 2017. (Stockdale Dep. 186, Ex. 5).

**RESPONSE:**

24.     Stockdale tried to identify the person in the report multiple times but was unable to locate the suspect, the reason for this was because he was a juvenile when the crime was committed. (Stockdale Dep. 193-195, Ex. 6; Bandy Ex. 14 pp. 1527- 1528). During a June 12 case review, Stockdale informed the team of the CODIS hit and when Lt. Ballard questioned Stockdale on why it was taking so long and why she could not find the match, she informed him that she had attempted to locate him but was not sure why she could not find him, and she could not understand why she could not find him; not that she did not understand how to read a CODIS report. (Stockdale Dep. 198-199).

**RESPONSE:**

25.    Stockdale noted the CODIS Report, that she had contacted DTF and followed up on the report on her daily activity report the day before. (Ballard Dep. 33, Ex. 9 p. 1516). During this time, Stockdale was assigned a homicide case which required significant time and was considered the unit's priority. (Stockdale Dep. 200, Ex. 11 p. 1527).

**RESPONSE:**

26.    Katie Hope, who had interviewed someone in the burglary case earlier that week, helped Stockdale locate the individual from the report, as it was not uncommon for CID to work as a team on cases. (Stockdale 38, 182; Bandy Dep. 78).

**RESPONSE:**

27.    Stockdale learned that her initial difficulty locating the suspect was due to the fact that he was a juvenile. It was not until he was arrested in Davidson County that they were able to locate him, but because he was a juvenile when the burglary was committed, they still had to charge him through juvenile court. (Stockdale Dep. 194, 201-203; MSJ Ex. 3, 6/19/18 Case Review Notes # 4305-4306). Even after the juvenile was finally located and it was discovered he was on GPS monitoring they still did not know who he was. (MSJ Ex. 3, 6/19/18 Case Review Notes # 4306).

**RESPONSE:**

28.    Gallatin has no policy regarding CODIS reports. In fact, Storment had just explained to the CID the process in a January 2018 case review, but it was also noted ATF was involved and GPD CID was taking direction from them. (Ballard Dep. 36; MSJ Ex. 4, 1/2/18 Case Review Notes # 4347-4348).

**RESPONSE:**

29.    While Lt. Ballard insisted there were 42 days between when Stockdale received the CODIS report and the June 12 meeting, there were only 25 working days. (Ballard Dep. 31; Bandy Dep. 114, Ex. 14 p. 001528).

**RESPONSE:**

30.     Delays in investigations, including major investigations such as burglaries, were not uncommon in CID due to a number of factors including prioritizing other major case developments, limited witnesses, and the overall complexity of the case. (Storment Decl. ¶¶12-13). This delay in locating the subject of the CODIS report was not more pressing than delays that occurred in other major investigations. (Storment Decl. ¶11).

**RESPONSE:**

31.     The June 21, 2018 discipline was the first and only written reprimand Stockdale had received from GPD. (Ballard Dep. 43).

**RESPONSE:**

32.     Stockdale approached Lt. Ballard and asked why she did not receive an oral reprimand instead of a written one, as oral reprimands are removed from employee's files after two years, where written reprimands are never removed. (Stockdale Dep. 209; Bandy Dep. 79, Ex. 14 p. 1529, Ex. 25 p. 0494). Lt. Ballard stated he could have given an oral reprimand but simply chose a written reprimand instead. (Stockdale Dep. 209; Bandy Dep. Ex. 14 p. 1529, Ex. 18 p. 002373).

**RESPONSE:**

33.     Written reprimands can impact employees' ability to find other employment. (Bandy Dep. 79).

**RESPONSE:**

34.     When Stockdale was placed on patrol, she was assigned day shift with twelve-hour shifts and no overtime. (Stockdale Dep. 211, 213).

**RESPONSE:**

35.     A move from CID is a demotion. (Storment Decl. ¶28). While the salary generally is the same, a patrol officer must interview and test for a position on CID as they would with any

other promotional role, and CID investigators receive additional on-call pay. (Storment Decl. ¶28). Further, it is generally accepted amongst law enforcement offices a patrol position is a more dangerous job. (Storment Decl. ¶¶29-30).

**RESPONSE:**

36.     After Stockdale's demotion, on June 26 and June 27, Chief Bandy received letters from Ashley's Place and DCS expressing their profound disappointment in losing Stockdale. (Bandy Dep. 117, Ex. 16-17). The Director of Ashley's Place stated, "[t]he loss of Investigator Stockdale is devastating not only to our team but to the children of Gallatin" and DCS stated that the loss "is ultimately hurting the families of this community." (Bandy Dep. Ex. 16, 17). Chief Bandy decided "it's just one of those things" and insisted they move on. (Bandy Dep. 118).

**RESPONSE:**

37.     Other employees were shocked, as this demotion was unprecedented. (Storment Decl. ¶¶24-25). It was especially shocking due to Stockdale's immense experience, all the training she received regarding sex crimes and crimes involving children. (Storment Decl. ¶ 25). This was a waste of GPD resources because Stockdale had an affinity for handling sex crimes, the training she received to work these crimes, and GPD would have to find someone for be the correct fit to investigate these crimes and train them. (Storment Decl. ¶¶25-26).

**RESPONSE:**

38.     On August 7, 2018, Stockdale was retaliated against again in the form of a three-day suspension starting August 10, related to rape kits that had been done on minors that the GPD did not pick up from Our Kids after her demotion. (Stockdale Dep. 221; Bandy Dep. Ex. 12 p. 001522).

**RESPONSE:**

39.     Chief Bandy made the decision but consulted Lt. Ballard; Ballard could not execute the discipline since he was no longer Stockdale's supervisor. (Ballard Dep. 57; Bandy Dep. 100).

Chief Bandy suspended Stockdale with no understanding of Our Kids' rape kit process and notification policies or protocols, including how long other investigators took to pick them up. (Bandy Dep. 101, 105). Capt. Novitsky also never checked with Our Kids about their standard procedures. (Novitsky Dep. 45).

**RESPONSE:**

40.     Typically, kits are not performed unless there is a history to suggest DNA evidence would be present within 120 hours of last sexual contact, and if performed on a child, it is either given to the responding detective or the detective is later informed when it is available for pick-up. (Dennis Decl.¶¶6-8). Our Kids stores and preserves the kit until it is picked up by law enforcement; there is no time frame within which a kit must be picked up, and it is not uncommon to notify law enforcement multiple times of the kits availability. (Dennis Decl. ¶¶8-11).

**RESPONSE:**

41.     The CID's July 17, 2018, case review notes reveal Ballard requested Bill [Storment] get details about how long they have to keep rape kits, because apparently no one at CID knew this information; and on July 31, 2018, Storment reported that they hold the kits for 3 years to see if a report is filed. (MSJ Ex. 5, 7/19, 7/31/18 Case Review Notes re: rape kits, pp. 4315, 4317).

**RESPONSE:**

42.     For the kits in question, Stockdale had obtained a confession from one perpetrator; and in the other, a federal agency had taken the lead and the perpetrator confessed to taking pictures. (Ballard Dep. 51-52). As such, both cases were closed by arrest, well before Stockdale was ever notified of any rape kits. (Ballard Dep. 51; Stockdale Dep. 251, 252). Thus, the availability of the rape kits had no impact on the outcome of the cases and at all times the chain of custody remained intact. (Stockdale Dep. 252; Bandy Dep. 116, 117; Ballard Dep. 49).

**RESPONSE:**

43.     Lt. Ballard told Capt. Novitsky it was uncommon for kits to be picked up at Our Kids. (Novitsky Dep. 36). Wherever the rape kit is performed is a secure part of the chain of custody, and at no point in time was the chain of custody regarding the rape kits broken. (Bandy Dep. 35, 100; Ballard Dep. 49; Dennis Decl.¶11).

**RESPONSE:**

44.     As for the suicide case in the suspension, this case involved the suicide of an 18-year-old in December of 2017. (Stockdale Dep. 225, 252). Per policy, Stockdale told the family they would need an order from the court to obtain the person's belongings since the decedent was not a minor. (Stockdale Dep.  253).

**RESPONSE:**

45.     While on patrol, Stockdale had an accident and was injured in the line of duty chasing a suspect. (Novitsky Dep. 29-30, Ex. 29).

**RESPONSE:**

46.     Stockdale also began experiencing numbness and tingling in her hands and feet. (Stockdale Dep. 241). This required multiple doctor's visits. Per policy doctor's notes were not required unless the employees missed three days of work, however Stockdale received a call from her sergeant stating she would need to provide a note for every doctor's appointment. (Stockdale Dep. 243).

**RESPONSE:**

47.     Ultimately, Stockdale was no longer comfortable being at work, the previous year had taken a toll on her physically and emotionally, she no longer felt trusted at work, she was being required to turn in doctor's notes for every visit despite the policy, and she was not allowed to access her previous case files from her time in CID for court, which impacted her ability to perform her job. (Stockdale Dep. 244-246; Bandy Ex. 20 p. 1012; Novitsky Dep. Ex. 29). Because the disciplinary actions and scrutiny continued to follow her on her position on patrol affecting her

evaluation, on June 21, 2019, Stockdale submitted her letter of resignation. (Bandy Dep. 20, 129, Ex. 21).

**RESPONSE:**

48.     Stockdale was replaced by two males, Jody Starks and Charles Cook, share Stockdale's DCS referrals. (Ballard Dep. 7; Bandy Dep. 92). Unlike Stockdale, Starks has not received any awards since he has been in the position. (Ballard Dep. 8, 9).

**RESPONSE:**

Respectfully submitted,

*/s Heather Moore Collins*
Heather Moore Collins BPR # 026099
Anne Hunter BPR # 022407
Ashley S. Walter BPR # 037651
Collins & Hunter PLLC
7000 Executive Center Dr., Suite 320
Brentwood, TN 37027
615-724-1996
615-691-7019 FAX
heather@collinshunter.com
anne@collinshunter.com
ashley@collinshunter.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 20th day of November 2020, a true and correct copy of the foregoing has been forwarded via the Court's electronic filing system to:

William N. Bates
A. Ryan Simmons
Farrar & Bates, LLP
211 Seventh Ave., N., Suite 500
Nashville, TN 37219
(615) 254-3060
bill.bates@farrar-bates.com
ryan.simmons@farrar-bates.com

*Counsel for Defendant City of Gallatin*

*/s/ Heather M. Collins*
Heather Moore Collins